IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Case No. 7:23-CR-00039-M

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MARCUS TERRELL BURNEY,

    Defendant.

ORDER

This matter comes before the court on Defendant Marcus Terrell Burney's ("Burney") Motion to Suppress [DE 21]. Burney seeks suppression of all evidence seized during a warrantless search of his vehicle following a traffic stop on March 8, 2023. The United States counters that law enforcement did not unreasonably prolong the traffic stop to permit time for a canine officer to arrive and conduct a passive sniff of the vehicle. The court heard the matter on November 2, 2023. Now, fully advised, the court finds suppression is not warranted and denies Defendant's motion.

**I.  Procedural History**

On April 25, 2023, Burney was charged by indictment with possessing a firearm knowing he had been previously convicted of a felony in violation of 18 U.S.C. §§ 922(g)(1) and 924. DE 1. On June 1, 2023, the court set the case for an initial appearance on July 5, 2023. At that time, however, Burney was in custody in the Western District of North Carolina (WDNC) and, due to transportation issues and other matters to be heard in the WDNC, Burney's initial appearance in this district was continued to August 30, 2023, at which Burney attended in person with his counsel

and was advised of the charges and maximum penalties. DE 16. Burney waived his detention hearing on September 13, 2023, and his arraignment was scheduled to occur on October 24, 2023. On September 25, 2023, however, Burney filed the present motion and his arraignment was continued pending resolution of the matter.

## II.     Factual Findings

The court finds the following facts to be undisputed and relevant to the issues raised herein.[1] Except as otherwise cited, these facts derive from the law enforcement officers' testimony, documents, and video presented at the hearing.

1.     On March 8, 2023, at approximately 12:30 p.m., Sampson County Deputy Jorge Fernandez observed a dark blue Dodge Charger with a tinted license plate cover traveling east bound on Interstate 40. Def. Ex. A.

2.     Fernandez testified that he has conducted hundreds of traffic stops and, if they proceed without problems, typical traffic stops are completed in ten-to-fifteen minutes.

3.     Fernandez pulled onto the highway and began following the vehicle. He ran a report of the license plate, which reflected that the plate was expired. *Id.*

4.     Fernandez conducted a traffic stop of the Charger, which immediately slowed to a stop and pulled over onto the highway's shoulder. Def. Ex. B, 1:13.

5.     Fernandez approached the Charger and stopped at the passenger side window. He requested the driver's license and vehicle registration. *Id.*, 1:31.

6.     The driver, later determined to be Burney, provided Fernandez his license and searched the vehicle for the registration card. *Id.*, 1:35-2:30

---

[1] Defendant's Exhibit A is a police report completed by Deputy Fernandez on March 14, 2023. DE 21-1. Defendant's Exhibit B is a video from Deputy Fernandez's dash camera depicting the traffic stop on March 8, 2023, from a view to the outside in front of the patrol car. DE 21-2.

2

7. Fernandez testified that he noticed Burney had just lit a cigarette, was breathing quickly, and appeared to be more nervous than the typical driver Fernandez encountered. He also observed that Burney searched everywhere inside the car for the registration card, except in the center console. Def. Ex. A.

8. As he did with all drivers he stopped, Fernandez asked Burney to exit the vehicle and enter his patrol car on the passenger side. Def. Ex. B., 2:35-2:44. Before Burney entered the patrol vehicle, Fernandez patted him down briefly to ensure Burney possessed no weapon(s). *Id.*, 2:50-2:55. The men entered the patrol car at approximately two minutes into the traffic stop. *Id.*, 2:58-3:02.

9. Once inside the vehicle, Fernandez proceeded to log into his computer program to complete the information necessary to issue Burney a written warning. First, he also called "5-25" on the radio, asking that the canine officer operating as part of his team come to the scene. *Id.*, 3:05.

10. Audio from the dashcam video reveals that Fernandez struck up a conversation with Burney regarding his expired tags, his travel plans, his car, and his employment. *Id.*, 3:05-9:48. The conversation was part of the ordinary incidents of a traffic stop.

11. The internal cabin video depicts Burney sitting in the passenger seat and, in the foreground, a computer monitor turned toward the driver's seat.

12. During the conversation, the video shows Fernandez tapping on the computer monitor. Fernandez testified credibly that he was typing information necessary to log in and complete the written warning, as well as to check law enforcement sites for any outstanding warrants on Burney and to determine whether Burney's vehicle may be reported missing or stolen.

13. At 3:18 on the video, Fernandez noted that the car registration had been expired "for awhile." Burney agreed and explained that he was going to "get it right today" after a birthday party at his sister's house. *Id.*, 3:18-3:35.

14. Fernandez also asked Burney where he was coming from and Burney responded, "Charlotte" and "I really gotta use the bathroom." Burney explained that he was planning to stop twenty miles ahead and asked, "do you think I can …? Nah, I'd be in the [camera] frame." *Id.*, 3:45-4:18. Fernandez responded, "I'll get you outta here in no time." *Id.*, 4:18-4:21.

15. At 4:28 on the video, Fernandez advised Burney, "I'm going to give you a warning," and Burney expressed his gratitude, stating that he would "take care of" the expired tag. *Id.*, 4:28-4:37.

16. At 4:44, Burney noted how hot it was in the car; Fernandez rolled down the window and stated that it was 56 degrees outside. *Id.*, 4:44-5:00.

17. At 5:08, Fernandez stated, "you ain't gonna get a citation today," and Burney again expressed his thanks. *Id.*, 5:08-5:11. Fernandez then complimented the Charger and the men proceeded to discuss the car and Burney's employment as Fernandez continued to type. *Id.*, 5:15-5:46. At 5:50, Fernandez read aloud a number he typed into the computer while Burney affirmed it was his driver's license number. *Id.*, 5:50-5:54. Fernandez then read aloud more information he was typing into the computer. *Id.*, 6:13-6:16, 6:23-28; 7:02-7:05.

18. At approximately 6:29 on the video, the canine officer, Deputy Akers, arrived and led the canine around the Charger to "sniff" for controlled substances. Deputy Akers testified that the dog was trained to detect cocaine, heroin, methamphetamine, and MDMA.

19. At approximately 6:49, the dog alerted at the rear passenger side of the Charger.

4

20. Meanwhile, the internal cabin video depicted Fernandez tapping on the computer monitor; he testified that he was focused on the computer and did not see the dog alert to the smell of narcotics.

21. After the dog departed at 6:51, Burney noted aloud, "I know that my record will pop up when you see it." *Id.*, 7:09-7:12. Fernandez responded that he had not looked at Burney's record and had not pulled it up. *Id.*, 7:13-7:16. Burney stated, "it was all in the past" and that he had "gotten out" and "gotten [his] CDL." *Id.*, 7:17-7:25. Fernandez stated, "I don't know what you're talking about. I haven't read the record yet." *Id.*, 7:25-7:27. Fernandez then said, "I'm about to check to make sure you don't have any warrants." *Id.*, 7:30-7:31. Burney responded, "I ain't got no warrants. I'm on probation." *Id.*, 7:32-7:33. Burney then explained that he was on "probation" from federal charges. *Id.*, 7:35-7:46.

22. After some silence, the men spoke more about Burney's job and the expired tags. *Id.*, 8:30-9:48. At 9:49, audio from the dashcam video depicted the sound of paper tearing, and Fernandez informed Burney that he would explain the written warning outside. The men exited the patrol car at 9:54 on the video.

23. Fernandez testified that he explained the procedure for the warning to Burney, while Akers stood nearby. Then, Akers informed Burney that the dog had alerted to a smell of narcotics in the Charger and, thus, the officers had probable cause to search the vehicle.

24. Fernandez proceeded to search the vehicle and found a firearm in the center console. *Id.*, 12:05; *see also* Def. Ex. A. He testified that he walked back to where Burney was standing and handcuffed him. A further search of the vehicle revealed a digital scale with powdery residue, empty sandwich bags, and an open bottle of tequila. Def. Ex. A.

5

## III. Legal Standards

The defendant bears the burden of proving that his Fourth Amendment rights were violated by the challenged search or seizure. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981) (citing *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)). "As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence. Once the defendant establishes a basis for his suppression motion, the burden shifts to the government." *United States v. Adkinson*, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citations omitted). On an order resolving a motion to suppress, the Fourth Circuit will review a district court's factual findings for clear error and legal conclusions de novo. *United States v. Hill*, 849 F.3d 195, 200 (4th Cir. 2017).

A traffic stop constitutes a "seizure" under the Fourth Amendment and, therefore, is subject to a reasonableness requirement. *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). When analyzing the constitutionality of a traffic stop, courts must first determine whether the officer's reason for the stop was legitimate. *Id.* (citation omitted). "Second, we examine whether the officer's actions during the seizure were 'reasonably related in scope' to the basis for the traffic stop." *Id.*

"A routine traffic stop becomes an unreasonable seizure when law enforcement impermissibly exceeds the stop's scope or duration." *Hill*, 849 F.3d at 200. That is, a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a citation or written warning. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (quoting *Caballes*, 543 U.S. at 408). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the

6

automobile's registration and proof of insurance." *Id.* A traffic stop becomes unlawful "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354.

Notably, "a dog sniff is not fairly characterized as part of the officer's traffic mission" but, rather, "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* at 355-56. Thus, absent reasonable, articulable suspicion of criminal activity, a detaining officer may not extend an otherwise-completed traffic stop in order to conduct a dog sniff. *Williams*, 808 F.3d at 245. "The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.'" *Rodriguez*, 575 U.S. at 357.

## IV. Analysis

In the present motion, Burney argues that Fernandez completed his "mission" for the traffic stop when he verbally informed Burney that he would issue a warning rather than a citation, and Fernandez did not have reasonable suspicion to extend the stop beyond that time. DE 21 at 4 ("the traffic stop should have ended sometime after Deputy Fernandez intended on issuing Mr. Burney the warning but before Deputy Akers conducted the dog sniff of the Dodge Charger."). According to the video evidence, Fernandez advised Burney he would give Burney a warning twice before the canine officer arrived. The United States counters that before, during, and after the dog sniff, Fernandez engaged in activities related to the traffic stop, such as completing a warning form, entering information into the computer, and running a background check.

The evidence presented demonstrates that the dog sniff of Burney's vehicle neither prolonged nor added any time to the traffic stop. Deputy Fernandez testified credibly that, while on patrol on March 8, 2023, he observed an illegal tinted license plate cover on Burney's Dodge Charger, followed Burney while checking the license plate, and initiated a stop when he learned

7

that the plate was expired. *See also* Def. Ex. A. While Burney, at the hearing, questioned whether the license plate cover was actually tinted (*see* Hrg. Ex. 1), he did not rebut the fact that his plate was expired, and the court finds the traffic stop was legitimate at its inception. *See United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018) ("An officer's initial 'decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.'") (quoting *Whren*, 517 U.S. at 810).

Notably, a seizure that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes" on a person's Fourth Amendment rights. *Id.* (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). That said, "the Fourth Amendment permits an officer to conduct an investigation *unrelated* to the reasons for the traffic stop as long as it '[does] not lengthen the roadside detention.'" *Id.* at 210 (quoting *Rodriguez*, 135 S. Ct. at 1614) (emphasis in original).

> For instance, police *during the course of a traffic stop* may question a vehicle's occupants on topics unrelated to the traffic infraction, or perform a dog sniff around the outside of a vehicle, as long as the police do not "extend an otherwise-completed traffic stop in order to conduct" these unrelated investigations. But, as noted previously, a traffic stop becomes unlawful when it is prolonged beyond the point at which "tasks tied to the traffic infraction are—or reasonably should have been—completed," even if only for a de minimis period of time.

*Id.* (citations omitted) (emphasis in original).

In this case, the evidence demonstrates that Fernandez has completed "hundreds" of traffic stops, completes them in ten-to-fifteen minutes if there are no problems, and asks every driver he stops to exit his or her vehicle and enter the patrol car with him[2] while he prepares a citation or written warning. With respect to Burney, the evidence shows that Fernandez was completing tasks related to the stop before, during, and after the dog sniff. Burney does not rebut Fernandez's

---

[2] Fernandez clarified that drivers may decline his invitation to enter his patrol car.

8

testimony nor the video/audio evidence reflecting that Fernandez was typing information into, and reviewing information produced by, the computer during the (nearly) seven minutes he and Burney sat in the patrol car. In fact, approximately four minutes after entering the patrol car, and *after* the dog alerted and was led away, Burney noted that Fernandez would see his record "pop up" on the computer and Fernandez advised that he had not yet checked Burney's background. During those initial four minutes, Fernandez was apparently logging into his computer and completing the written warning; the court finds this duration is not unreasonable. Also reasonable is that Fernandez completed all tasks related to the traffic stop in fewer than ten minutes. *See United States v. Villavicencio*, 825 F. App'x 88, 96-97 (4th Cir. 2020), *cert. denied*, 208 L. Ed. 2d 473, 141 S. Ct. 933 (2020) (finding an officer "completed all necessary tasks incident to the stop" for a traffic stop that lasted eighteen minutes (thirteen in the patrol car), in which the officer asked the driver to accompany her to the patrol car, briefly "frisked" the driver for officer safety, entered information into her computer to prepare a written warning and check the driver's license and background, and conversed with the driver while "these checks were running"). The court finds Fernandez's "actions during the seizure were 'reasonably related in scope' to the basis for the traffic stop." *Williams*, 808 F.3d at 245.

Burney suggested at the hearing that Fernandez's motive for initiating the traffic stop—i.e., that as a member of a drug interdiction team, Fernandez desired solely to create opportunities to search certain vehicles for evidence of drug trafficking—was improper and, thus, the United States did not meet its burden to demonstrate that the warrantless search complied with the Fourth Amendment. The court is not convinced. "[T]he constitutional reasonableness of traffic stops [does not] depend[] on the actual motivations of the individual officers involved." *Whren*, 517 U.S. at 813; *see also United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996) (an officer's

9

"motives for stopping an automobile that was violating traffic laws is irrelevant to the legitimacy of the stop under a Fourth Amendment analysis."). Moreover, the court observed Fernandez's conduct, while on the stand and in the video, and finds his testimony credible and his actions legitimate during the lawful traffic stop on March 8, 2023.

V.      **Conclusion**

Accordingly, the court finds Fernandez's reason for stopping Burney on March 8, 2023—tinted license plate cover and expired tag—was legitimate and Fernandez's actions during the seizure were reasonably related in scope to the basis for the traffic stop. In the space of fewer than ten minutes, Fernandez completed the tasks necessary to complete his mission of issuing a written warning; within that reasonable period, a canine officer arrived and completed a passive air sniff around Burney's vehicle. The evidence presented shows that Fernandez did not unnecessarily prolong the traffic stop in violation of the Fourth Amendment. Therefore, Defendant's motion to suppress [DE 21] is DENIED.

SO ORDERED this 7th day of November, 2023.

*Richard E Myers II*
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE